In re **RESERVE CAPITAL CORPORATION,**
Debtor.

In re **Hawkins Development LLC,** Debtor.

In re **James W. & Lori Jo Hawkins,** Debtor.

In re **Hawkins Family, LLC,** Debtor.

In re **Hawkins Manufactured Housing, Inc.,** Debtor.

In re **Forest View, LLC,** Debtor.

In re **Wooded Estates, LLC,** Debtor.

In re **Tioga Park, LCC,** Debtor.

Nos. 03–60071, 03–60072, 03–60073, 03–60074, 03–60075, 03–60076, 03–60077, 03–60078.

United States Bankruptcy Court, N.D. New York.

Jan. 16, 2009.

Paul A. Levine, Esq., Lemery Greisler, LLC, Albany, NY, Trustee.

Craig R. Fritzsch, Esq., Binghamton, NY, for Jointly Administered Debtors, James W. and Lori Jo Hawkins, Individually.

James W. Hawkins, Harpursville, NY, for Debtor.

## MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

On April 23, 2008, Paul Arthur Levine, the Chapter 11 Trustee herein ("Trustee"), filed a motion pursuant to Federal Rule of Bankruptcy Procedure ("Fed.R.Bankr.P.") 9011 seeking sanctions against one of the Jointly Administered Debtors, James Hawkins ("Hawkins"), and the attorney for the Jointly Administered Debtors, Craig R. Fritzsch ("Fritzsch") (the "Sanction Motion"). The Sanction Motion was made returnable on June 24, 2008 at Utica, New York, at the Court's regular motion calendar held on that date. Responses in opposition to the motion were filed by Hawkins and Fritzsch on May 9, 2008 and June 10, 2008, respectively. On May 19, 2008, the Trustee filed a Reply to the opposition of Hawkins. Hawkins then responded to the Trustee's Reply on June 13, 2008. Finally, on June 13, 2008, the Trustee responded to Fritzsch's opposition to the Sanction Motion.

The Sanction Motion came on for argument on June 24, 2008. At the conclusion of the argument, the Court took this contested matter under submission without requiring the filing of any memoranda of law.[1]

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1) and (b)(2)(O).

## FACTS

The alleged sanctionable conduct engaged in by Hawkins and Fritzsch was their filing of a motion on or about March 20, 2008, seeking to hold the Trustee in contempt of a prior Order of this Court (the "Contempt Motion"). The Contempt Motion was heard by the Court on April 22, 2008 and denied. An Order denying the Contempt Motion was signed on April 29, 2008 and entered on the docket on April 30, 2008 ("Contempt Order"). The Contempt Order was appealed by Hawkins to the U.S. District Court for the Northern District of New York ("District Court"), and on January 13, 2009, the Hon. Lawrence E. Kahn, U.S. District Judge, dismissed the appeal of the Contempt Order as being without basis.

In their Contempt Motion, Hawkins and Fritzsch essentially asserted that the Trustee, by seeking to have a real estate broker appointed and commencing an action in New York State Supreme Court ("State Court") to evict the Hawkins from their Residence, has engaged in a process to bring about the sale of Hawkins' residence located at 17 McCoy Road in the Town of Colesville, County of Broome, State of New York ("Colesville property" or "Residence") in direct contravention of

---

[1] The Trustee also requests what he terms a "vexatious litigant order" requiring both Hawkins and Fritzsch to seek permission of the Court prior to filing any further papers in the above-referenced cases. *See* Trustee's Response to Further Submissions of James W. Hawkins Individually and Craig R. Fritzsch as Attorney for James W. Hawkins, filed June 27, 2008 (Dkt. No. 764) at ¶ 24 (citing *In re Aarismaa*, 233 B.R. 233 (N.D.N.Y.), *aff'd sub nom. Aarismaa v. Jordan*, 182 F.3d 898, 1999 WL 461789 (1999)). On July 3, 2008, Fritzsch filed a Reply to the Trustee's Response.

an Order of this Court entered on June 2, 2004, which confirmed the joint plan of reorganization of Tioga Park, LLC ("Tioga Park Plan"), formerly one of the Jointly Administered Debtors, and other entities.[2] More specifically, Hawkins and Fritzsch argued that the Trustee's conduct was in violation of a certain Memorandum Agreement, which was attached to the Disclosure Statement and referenced in the Tioga Park Plan, which Agreement granted to Hawkins and his wife, also a Jointly Administered Debtor, "exclusive possession" of their Residence.

The Memorandum Agreement, referred to by Hawkins and Fritzsch, was dated March 5, 2004, and provided that the Colesville property be conveyed to Asolare II, LLC ("Asolare").[3] *See* Memorandum Agreement at ¶ III(C). The Memorandum Agreement granted to James and Lori Hawkins, who were debtors-in-possession at the time of its execution, the right to repurchase the Colesville property from Asolare for the sum of $100,000, plus the payment of any real property taxes due at the time of the transfer. The Memorandum Agreement also states that Asolare and Hawkins agreed to execute a contract for purchase and sale of the property which would provide

a time of the essence closing date not more than thirty (30) days following confirmation of the Tioga Park LLC Joint Plan and the plans in each of the jointly

administered cases, or conversion and discharge of James and Lori Hawkins, or such Order of the Court which deems such property as exempt or otherwise excluded from the administration of their Estate. Pending such conveyance, Asolare agrees that Hawkins may have exclusive possession of the property in consideration for the continued maintenance of the premises and payment of all expenses in connection therewith.

Memorandum Agreement at III(C).

In ¶ IV of the same Agreement, Southern Tier and two other entities, identified as NEWCO and Jeffrey Gural, agreed to provide purchase money financing to the Hawkins' in the sum of $100,000, secured by a mortgage "against such property to be repaid by Hawkins based upon a fifteen (15) year amortization with a two (2) year balloon." It is the foregoing obligation, which Hawkins and Fritzsch assert was incorporated into the Tioga Park Plan and approved by the June 1, 2004 Order, that they argue was subsequently violated by the Trustee in bringing about the sale of the Colesville property pursuant to the Court's Order of July 8, 2008, approving the sale ("Sale Order").[4]

The Trustee notes that this Court granted his Motion to Compromise, over the objections of Jointly Administered Debtors, including Hawkins, by a Memorandum Decision and Order, dated March 7, 2005

---

**2.** On June 1, 2004, this Court signed an Order Approving Disclosure Statement and Confirming Joint Chapter 11 Plan of Reorganization proposed by Tioga Park, LLC, Asolare II, LLC and Southern Tier Acquisition, LLC ("Confirmation Order"). The Tioga Park Plan, as confirmed, incorporated the terms of a prior Order of the Court, dated May 17, 2004.

**3.** In a letter from Michael Rhodes–Devey, Esq. on behalf of Asolare, Southern Tier Acquisition, Jeffrey Gural and John Simmonds, dated September 27, 2004, addressed to

Fritzsch, it was alleged that Hawkins both individually and as fiduciary of Hawkins Family, LLC had failed to transfer the Colesville property to Asolare either by motion or by a confirmed chapter 11 plan. *See* Attachment to Asolare's Reply in support of the Trustee's Motion to Employ a Realtor (Dkt. No. 588).

**4.** By Decision and Order, dated January 13, 2009, Judge Kahn also dismissed the appeal of the Sale Order, finding it without any basis.

(the "Compromise Order"). At some point in these proceedings, the Trustee apprized the Court of an error of fact found in the Compromise Order. In said Order, the Court stated that the Trustee proposed the payment of the sum of $70,000 "in settlement of the obligation of Southern Tier Acquisition, LLC and another party, Jeff Gural, to provide James Hawkins, individually with funding that would have permitted Hawkins to repurchase his home, plus the sum of $70,000 to apply toward the payment of priority sales tax claims. . . ." Compromise Order at 6. The Trustee clarified that the settlement provided for a single payment of $70,000 to be applied to the payment of priority sales tax claims. The Motion to Compromise stated that the acceptance of said $70,000 was "without prejudice to the rights of Southern Tier Acquisition, LLC and Mr. Gural to contest any further obligation to Mr. Hawkins with respect to the purchase of his residence." *See* Motion to Compromise at ¶ 50. Unfortunately, because the Compromise Order was on appeal to the District Court at the time, this Court was without jurisdiction to issue an *errata*. However,

it is clear from the Decision and Order of the Hon. Lawrence E. Kahn, U.S. District Judge, dated January 30, 2007, that he recognized that the settlement involved a single payment of $70,000 to be used "to fund money into the bankruptcy estates in recognition of priority tax claims." *See* Judge Kahn's Decision and Order at 4 and 10–11.

The Trustee points out that the Compromise Order was affirmed by Judge Kahn based on his finding that this Court had not abused its discretion in concluding that the proposed compromises were fair and reasonable. *See id.* at 9.[5] The Trustee also points to an Order of this Court, dated June 7, 2006 ("Broker Order"), which authorized him to appoint a real estate broker to market the Hawkins' Residence.[6] Finally, the Trustee references the February 14, 2008 Decision and Order of the Hon. Jeffrey A. Tait, Justice of the New York State Supreme Court, Broome County, granting the Trustee's motion for summary judgment in the action commenced in State Court in which the Trustee sought a warrant of eviction against the Hawkins (the "Eviction Order").[7] *See* Exhibit 6, attached to the Sanction Motion.

---

5. In his Decision and Order of January 30, 2007, Judge Kahn remanded the matter to this Court with the direction that it consider whether or not the Compromise Order "constituted an impermissible post-confirmation of the Tioga Park Plan." *Id.* at 12. On July 6, 2007, this Court, having considered the matters remanded to it by Judge Kahn, concluded that the Court's Compromise Order did not constitute a postconfirmation modification of the Tioga Park Plan (the "Remand Order"). The Court also made it clear that the $100,000 provision involving the loan to Hawkins to purchase the Colesville property from Asolare remained "completely unaltered." *See* Remand Order at 13 and n. 11. On July 13, 2007, the Hawkins' filed a Notice of Appeal of the Remand Order. On July 26, 2007, Judge Kahn dismissed that appeal for Hawkins' failure to comply with Fed. R.Bankr.P. 8006. Hawkins then moved

Judge Kahn to reconsider his dismissal order, which motion he denied on November 7th. Undaunted, Hawkins appealed from the November 7th Order of Judge Kahn to the U.S. Court of Appeals for the Second Circuit ("Second Circuit"). On October 7, 2008, the Second Circuit vacated the November 7, 2007 Order and remanded the matter to the District Court for further proceedings. This Court is not aware of any further determination by the District Court as of the date hereof. *See* Case No. 07:cv–766.

6. On June 12, 2006, Hawkins' filed a Notice of Appeal of the Broker Order. The Appeal was subsequently dismissed by an Order of Judge Kahn dated October 26, 2006.

7. The Court has been advised that the Eviction Order has been appealed by the Hawkins' to the Appellate Division of the New York

## ARGUMENTS

The Trustee contends that Hawkins and Fritzsch, in filing the Contempt Motion, did so in total disregard of the prior decisions of this Court, the U.S. District Court for the Northern District of New York, and the New York State Supreme Court. He notes that in various arguments before these other courts, Hawkins and Fritzsch have continued to advance the position that the Memorandum Agreement remains in full force and effect.[8] The Trustee suggests that the Contempt Motion was but another attempt to harass him and delay the Chapter 11 cases. He further notes that on April 2, 2008, in compliance with the so-called "safe harbor" provision of Fed.R.Bankr.P. 9011(c)(1)(A), he demanded in writing that the Contempt Motion be withdrawn, but that Hawkins and Fritzsch ignored that demand and proceeded with the Motion on April 22, 2008. The Trustee notes that in defending the Contempt Motion (and presumably in preparing, filing and arguing this motion), he has been forced to expend time and effort for which he will seek compensation from the Chapter 11 estates. With regard to his contention that both Hawkins and Fritzsch should be sanctioned, he observes that while Fritzsch did not actually respond to this motion for sanctions,[9] Hawkins did interpose *pro se* opposition in which he continues to ignore the various Court Or-

ders. The Trustee argues that "[s]ince his appointment the Trustee has been patient, perhaps overly so, with Mr. Hawkins and his attorney Craig Fritzsch when they have repeatedly chosen to ignore facts and orders and rulings of this and several other courts." *See* Reply to Opposition of James W. Hawkins to Trustee's Motion for Sanctions Pursuant to Fed.R.Bankr.P. 9011, dated May 19, 2008 (Dkt. No. 735), at ¶ 19.

In his response to the Sanction Motion, James W. Hawkins, acting *pro se*, again accuses the Trustee of violating the Memorandum Agreement by seeking to evict him and his wife from their Residence in Colesville in order to sell the property. He disputes the Trustee's assertion that the Memorandum Agreement was only "allegedly" incorporated in the Tioga Park Plan. He contends that "the clouding, misleading and obfuscating nature of Mr. Levine's applications is legend." *See* undated response of James W. Hawkins, individually and as equity security holder for all of the jointly administered debtors, filed on May 9, 2008 (Dkt. No. 731) at ¶ 3. He notes alternatively that the eviction proceeding commenced by the Trustee in State Court was taken in "total disregard to court decisions" given the provision [in the Memorandum Agreement that he contends was

State Supreme Court and that appeal is presently pending. Allegedly, the Hawkins' request for a stay pending the appeal was denied.

8. In a separate unsigned document identified as "Sur–Reply to Trustee's Reply and Asolare II, LLC's Reply" filed on March 27, 2006 (Docket No. 590) in connection with the Trustee's motion to appoint a real estate broker to market the Colesville property, the statement is made by Hawkins that "[i]t is the debtor's position that the Memorandum Agreement is an order of the Court." *Id.* at ¶ 4. *See also* Transcript ("Tr.") of March 28, 2006 Hearing on Trustee's motion to appoint a real estate

broker at 8 (Fritzsch states that "[we believe that the memorandum agreement was made an order of the Court. . . . Because it was I believe incorporated into the disclosure statement which was approved and made part of the Court's order in Tioga Park."]).

9. Actually Fritzsch did respond to the motion by filing a Response on June 10, 2008 (Dkt. No. 745); however, at the time of the Trustee's May 19th Reply to Hawkins' Opposition, Fritzsch had not yet filed his Response. The Trustee replied to Fritzsch's Response on June 13, 2008 (Dkt. No. 753).

an Order of this Court] granting him and his wife exclusive possession of the property *Id.* at ¶ 5. Hawkins argues that the Trustee's eviction proceeding was based on "complete thin air" since this Court had issued an order of adequate protection in July of 2003, which compelled Hawkins to make periodic payments to the secured creditor and presumably protect his right to buy back and continue in possession of his Residence.[10] *Id.* at ¶ 6.

Hawkins notes that certain prior orders the Trustee relies on are currently on appeal to a higher court. *Id.* at ¶ 8. He takes specific issue with the Trustee's reliance on this Court's Broker Order, which permitted the Trustee to retain a realtor to sell the Hawkins' Residence. *Id.* at 9. He alludes to the comments made by this Court on March 28, 2006, the date of the hearing on the Trustee's motion to appoint a broker. *Id.* at 11. Indeed, at that hearing, the Court stated that the Trustee's application was "simply for the limited purpose of allowing Mr. Levine to employ a realtor" and was not tantamount to an application to sell or take possession of the Residence. *See* March 28th Tr. at 11. The Court further stated that "[t]he real war will come, if it's going to come at all, when he [Trustee] proposes under Section 363(f) to sell the property presumably. And I'm not making any finding on the merits of the dispute." *Id.* at 10–11. In addition, Hawkins accuses the Trustee of failing to obtain Court approval for any of the sales of the Debtors' real estate, dating back to October 2004, and asserts that the Trustee turned over the proceeds of those sales to the secured creditor, "who had filed a knowingly false transfer of claim," rather than retaining the proceeds in escrow as the Court had orally ordered. *See* undated response of James W. Hawkins, individually and as equity security holder for all of the jointly administered debtors at ¶ 12.

In his Reply to the Opposition of James W. Hawkins To Trustee's Motion for Sanctions, dated May 19, 2008, the Trustee notes, as indicated previously, that Fritzsch did not oppose the Sanctions Motion and opines that Hawkins' response "demonstrates beyond doubt that he too is responsible for the sanctionable conduct to which Attorney Fritzsch previously would sign his name and reputation." *See* Reply to the Opposition (Dkt. No. at 735) at ¶ 12. The Trustee again points to the prior orders of this and other courts that entitled him to seek an eviction order in State Court. With regard to Hawkins' assertion that there was never any order approving the sales of real estate, the Trustee refers the Court to its Order of October 29, 2004 which expressly approved the auction sales of various parcels of real property, as well as the Court's Memorandum–Decision and Order of March 7, 2005 which, *inter alia,* authorized the Trustee to turn over the sale proceeds to Asolare.

Fritzsch's Response to the Sanction Motion appears to draw a distinction between the Hawkins as individual debtors and Hawkins as equity shareholders of the corporate Debtors. He refers to them as "hybrids." *See* Response of Fritzsch, dated June 9, 2008 (Dkt. No. 745) at ¶ 1.

---

**10.** The Order to which Hawkins apparently refers was entered on July 31, 2003, more than a year prior to the appointment of the Trustee. Interestingly, there is no allegation that Hawkins ever made any of the required adequate protection payments. The Trustee in his Motion to Compromise, dated November 19, 2004, at ¶ 22 noted that Asolare, then the owner of all of the secured debt of the Jointly Administered Debtors, had demanded that the Trustee make the adequate protection payments, but that the Trustee had resisted because he was in the process of selling all of the real property of the Jointly Administered Chapter 11 estates, sales which later produced offers of approximately $2.4 million.

Fritzsch, in much the same vein as his clients, asserts that the prior contempt motion that he authored on behalf of the Debtors was not "baseless and in bad faith." *Id.* at ¶ 6. He opines that this Court simply "declined to enforce the unambiguous terms of one of its prior orders," and further that "[t]he decision of the court not to enforce its own order is more proper (*sic*) characterization that (*sic*) alleging that the conduct is baseless (*sic*) in bad faith and sanctionable." *Id.* at ¶ 7.

## DISCUSSION

Fed.R.Bankr.P. 9011(b) provides that an attorney or an unrepresented party when filing a written motion certifies that to the best of the attorney or unrepresented party's knowledge, information or belief formed after reasonable inquiry that:

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifi-

cally so identified, are reasonably based on a lack of information or belief.

The Trustee's position herein would seem to squarely rely on subsections (1) and (3) of Fed.R.Bankr.P. 9011(b). He has alleged that the Contempt Motion filed by Fritzsch was clearly a form of harassment and delay and has noted that he intends to seek compensation from the Jointly Administered Estates for having had to defend it. Additionally, the Trustee argues that the factual allegations of Fritzsch (and Hawkins) have absolutely no basis in the record of theses cases and, in fact, have been rejected by at least three courts.

It would appear that the genesis of the Contempt Motion was the so-called Memorandum Agreement, which was attached to the Disclosure Statement and referenced in the "Conclusion" of the Tioga Park Plan, confirmed by this Court by an Order, dated June 1, 2004. Clearly, the Memorandum Agreement granted three basic benefits to the Hawkins. First was the right to repurchase their Residence from Asolare for the sum of $100,000 following the sale of the property by Hawkins Family, LLC to Asolare; the second was the right to remain in possession of the Residence pending the repurchase, and third was the obligation of Southern Tier Acquisition and Jeffrey Gural to provide the Hawkins with the necessary funding to bring about the repurchase.

This Court previously stated from the bench that whatever rights Hawkins might have under the Memorandum Agreement should be enforced in State Court.[11] At

---

11. *See* Recording of Hearing on December 16, 2004, beginning at 1:13:40 p.m. and addressing Hawkins motion to compel compliance with the Memorandum Agreement (Court stating that it believed the rights of Hawkins with respect to their Residence to be a private right and not an asset of the Hawkins chapter 11 and, therefore, any dispute concerning that right belongs in another court); Recording of Hearing on January 27, 2005, beginning at 12:21:40 p.m. and addressing the Trustee's Motion to Compromise (Court noting that if Fritzsch was representing the Hawkins as individuals, rather than as chapter 11 debtors, any disputes concerning

the hearing on March 28, 2006 on the Trustee's Broker Motion, the Trustee indicated that he had indeed commenced an eviction action in State Court in which Hawkins had raised the defense of breach of contract. *See* March 28th Tr. at 6–7. In the State Court action in which the Trustee filed a motion for summary judgment, Judge Tait made a finding that the Hawkins Family, LLC "is the undisputed owner" of the Colesville property and that the Hawkins were month-to-month tenants. *See* Eviction Order at 2. He also made a finding that the terms of the Memorandum Agreement had not been performed. *Id.* at 3. Ultimately, he granted the Trustee's motion and Hawkins has appealed the Eviction Order.

In the Contempt Motion, Fritzsch alleged that the Memorandum Agreement was incorporated into the Tioga Park Plan. Indeed, in the "Conclusion" of the Tioga Park Plan (Dkt. No. 193), filed March 10, 2004, the statement is made that the Tioga Park Plan has been approved "by each of the Joint Proponents, and by each of the joint venture parties with respect to ... the obligations of each party as provided under the Memorandum Agreement [12] and collateral documents existing and as contemplated therein and in this Plan."

The Tioga Park Plan was modified by the terms of the Order, dated May 17, 2004 (Dkt. No. 252), incorporating the terms of a Consulting Agreement into "any Order Confirming Joint Chapter 11 Plan," including a provision whereby Hawkins was to be paid 45% of an annual consulting fee of $100,000 and deemed necessary for the support of [the] Debtors and their dependents. *See* May 17th Order at

¶ D(1). In addition, a 2% interest, which was to be conveyed by the "post-confirmation transferee" as an "inducement for enhanced performance by the Consultant" (Hawkins), was to be purchased by the post-confirmation transferee [NEWCO] and paid "to the Estate of James W. and Lori Jo Hawkins for distribution on confirmation in such Estate." *See id.* at ¶ D(2).

There was no expressed reference to the Memorandum Agreement and its provision regarding the right of the Hawkins to repurchase the Colesville property from Asolare for the sum of $100,000 in the May 17th Order. However, the Confirmation Order confirming the Tioga Park Plan does provide that "any of the agreements entered into by the Debtor as expressly referenced and incorporated in the Disclosure Statement and Joint Plan, and any agreement contemplated pursuant to the terms of the confirmed Joint Plan are hereby deemed authorized and approved." *See* Confirmation Order. Fritzsch alleges that the fact that "the Court declined to enforce the unambiguous terms of one of its prior orders (Confirmation Order) does not render the motion (Contempt Motion) baseless and made in bad faith."

As the Trustee points out both in his Sanction Motion and in his opposition to the Contempt Motion, regardless of whether or not the Memorandum Agreement was incorporated into the Tioga Park Plan or was simply a freestanding agreement, both constituted independent contracts between the parties. As such, this Court opined that the private rights of the Hawkins set forth in the Memorandum Agreement were more properly addressed in the State Court. This view was acknowledged

the Memorandum Agreement should be addressed in another court.)

**12.** "Memorandum Agreement" is defined in the Tioga Park Plan as "[t]he written agree-

ment of the Joint Plan Proponents executed on March 5, 2004 a copy of which is attached in its entirety to the Disclosure Statement filed simultaneously herewith."

by the Trustee in his Motion to Compromise, approved by the Court's Compromise Order of March 7, 2005, as well as the subsequent Order of the District Court on appeal and the Order of the State Court in the eviction proceeding.[13]

Specifically, at ¶ 50 of the Trustee's Motion to Compromise, he notes

[a]s to the obligation of Southern Tier Acquisition, LLC and Mr. Gural to provide funding to Mr. Hawkins for the purpose of facilitating the purchase of his home and, in addition, $70,000 for application towards repayment of priority sales tax claims, the Trustee proposes to accept payment of $70,000 without prejudice to the rights of Southern Tier Acquisition, LLC and Mr. Gural to contest any further obligation to Mr. Hawkins with respect to the purchase of his residence.

It is this paragraph that the Trustee points to as the primary basis for his assertion that the Hawkins' right to continue in possession of their Residence pending its repurchase was a matter for the State Court to address once the Motion to Compromise was approved by the Compromise Order. On the other hand, Hawkins and Fritzsch argue that because the Trustee did not ask for a modification of the Tioga Park Confirmation Order, which allegedly incorporated the terms of the Memorandum Agreement, including the Hawkins' right to exclusive possession to the Residence, the Trustee has acted in contempt of the Confirmation Order. The Trustee responds that the contention of Hawkins and Fritzsch simply cannot be maintained in light of the Compromise Or-

der of this Court, its affirmance by the District Court by Order, dated January 30, 2007, as well as the Broker Order, and most importantly, the Eviction Order.

It is clear from this Court's denial of the Contempt Motion that it did not agree with Hawkins and Fritzsch that the Trustee's actions to evict the Hawkins' from their Residence and subsequently to cause the Residence to be sold were contrary to the Confirmation Order or the Memorandum Agreement or in violation of any other rights of the Hawkins emanating from other orders of this Court or otherwise. The only remaining question is whether or not the conduct of Fritzsch and/or Hawkins in filing the Contempt Motion rose to the level of sanctionable conduct pursuant to Fed.R.Bankr.P. 9011.

 Whether to impose sanctions pursuant to Fed.R.Bankr.P. 9011/ Fed.R.Civ.P. 11 is a matter of the Court's discretion. *See Perez v. Posse Comitatus,* 373 F.3d 321, 325 (2d Cir.2004). Attorney's fees may be imposed either on the attorney who signed the pleading, motion or other paper during the course of the proceedings or on the party he/she represents or on both pursuant to Fed.R.Civ.P. 11.[14] *See Oliveri v. Thompson,* 803 F.2d 1265, 1274 (2d Cir.1986). Under appropriate circumstances, sanctions are to be allocated between attorney and client according to their relative culpability. *In re Alberto,* 119 B.R. 985, 993 (Bankr.N.D.Ill. 1990) (citation omitted); *see also In re TCI Ltd.,* 769 F.2d 441, 446 (7th Cir.1985) (stating that "[w]hen lawyers yield to the temptation to file baseless pleadings to appease

---

**13.** Hawkins, of course, points out that various Orders that the Trustee relies on are on appeal.

**14.** Fed.R.Bankr.P. 9011(c)(2)(A) provides that "sanctions may not be awarded against a represented party for a violation of subdivi-

sion (b)(2), which addresses claims, defenses, and other legal contentions certified in the signed document or pleading as being warranted by existing law. As noted earlier, the focus of this decision is on subdivisions (b)(1) and (b)(3)''.

clients, however, they must understand that their adversary's fees become a cost of their business").

■■■ An award of sanctions pursuant to Fed.R.Civ.P. 11 will lie "when it appears that a competent attorney could not form the requisite reasonable belief as to the validity of what is asserted in the paper." *Oliveri*, at 1275; *see also Ball v. A.O. Smith Corp.*, 451 F.3d 66, 70 (2d. Cir. 2006) (indicating that "Rule 11(b) is violated when an attorney presents a pleading for an improper purpose or presents a frivolous claim or legal contention . . . ."). Ultimately, the standard requires a finding of objective unreasonableness of the individual making the statement in the pleading. *See Margo v. Weiss*, 213 F.3d 55, 65 (2d Cir.2000); *see also Oliveri*, 803 F.2d at 1275 (holding that "there is no necessary subjective component to a proper rule 11 analysis. Removing any subjective good faith component from rule 11 analysis should reduce the need for satellite litigation . . . .").

■■■ As an initial inquiry, the Court must examine whether or not the party seeking sanctions under Fed.R.Bankr.P. 9011 complied with the so called "safe harbor" provision found in subsection (c)(1)(A), which mandates that the party sought to be sanctioned be given a period of 21 days following service of the motion in which to withdraw or appropriately correct the challenged paper. *See Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1327–28 (2d Cir.1995). Here the Trustee asserts that on April 2, 2008 a member of his law firm sent a letter to Fritzsch advising him that unless he withdrew the Contempt Motion within 21 days of the date of the letter, the Trustee would file the Fed.R.Bankr.P. 9011 motion with the Court. *See* April 2, 2008 letter from Gretchen M. Greisler, Esq. addressed to Fritzsch and copied to Hawkins, attached as Exhibit A

to Trustee's Reply (Dkt. No. 735). There is no dispute that Fritzsch did not withdraw the Contempt Motion. Instead he proceeded with the argument of the Contempt Motion on April 22, 2008. Thus, the Court finds that the Trustee has complied with Fed.R.Bankr.P. 9011(c)(1)(A).

Turning to the nature of the sanctionable conduct, the Court begins with a review of the Contempt Motion. That Motion was premised on Fritzsch's contention that the Memorandum Agreement was incorporated into the Tioga Park Plan and granted to the Hawkins the exclusive possession of their Residence in Colesville, New York. The Contempt Motion further asserted that while the Trustee filed a motion compromising certain portions of the Tioga Park Plan with regard to the rights granted to the Hawkins', "[n]owhere in the application for compromise did Mr. Levine ask for the terms of the order confirming the plan of reorganization incorporating the Memorandum Agreement be modified to change the language contained therein that the debtors were to maintain exclusive possession of the real estate." This argument seems to be a recurring theme in all of Fritzsch's opposition to the ultimate sale of the Colesville real property.

■■■ At the time the Memorandum Agreement was executed and referenced in the Tioga Park Plan, which was confirmed by the Court on June 1, 2004, there was no trustee in any of the Debtors' cases. However, upon his appointment on September 16, 2004, the Trustee took on a number of duties pursuant to Code § 1106 and Code § 704, as incorporated in Code § 1106(a)(1). As noted by one court, "[t]he duties and responsibilities of either a Chapter 11 trustee . . . as a fiduciary for the bankruptcy estate are virtually the same as those imposed on a Chapter 7 trustee." *Corzin v. Fordu (In re Fordu),*

201 F.3d 693, 706 n. 18 (6th Cir.1999). In addition to those duties expressly enumerated in the statute, the Trustee has the authority to seek approval of the sale of property of the estate pursuant to Code § 363. *See Golf 255, Inc. v. Eggmann,* Case No. 07–MC–15–DRH, 2007 WL 781916, at *2 (S.D.Ill.2007).

■ In this case, the Hawkins were permitted to continue in possession of the Colesville property. The Colesville property is actually property of the estate of Hawkins Family, LLC, a finding of fact found in Judge Tait's Eviction Order. As noted previously at Footnote 3, apparently the Colesville property was never transferred to Asolare as required under the terms of the Memorandum Agreement.[15] The fact that it remained estate property is reaffirmed by the provision in the Memorandum Agreement that without an Order of this Court excluding the property from the administration of their Estate, it remained property of the Debtors' Estate. According to the docket, no such Order was ever obtained. As such, it was subject to disposition by the Trustee for the benefit of the Debtors' creditors upon his appointment.

■ Fritzsch also asserts in somewhat of a backup argument that the Motion to Compromise was an impermissible modification of the Tioga Park Confirmation Order. The latter argument did gain some credence with U.S. District Judge Kahn on Fritzsch's appeal of the Compromise Order. Judge Kahn remanded to this Court the issue of whether or not the Compromise Order constituted an improper modification of the Tioga Park Plan. *See* Judge Kahn's Decision and Order dated January 30, 2007. By its Remand Order of July 6,

2007, this Court concluded that the Compromise Order did not constitute an improper modification of the Tioga Park Plan. This Court's Remand Order, as well as Judge Kahn's Decision and Order, are both, of course, on appeal.

In opposing the Contempt Motion, the Trustee pointed to the foregoing Orders, as well as the Broker Order of June 7, 2006, and the State Court Eviction Order of February 14, 2008, concluding that by filing the Contempt Motion, "Hawkins and Fritzsch are attempting to circumvent the prior proceedings in this Court as well as in the District Court and in the New York State Supreme Court." *See* Trustee's Opposition to Motion for Contempt at ¶ 14.

With respect to the Trustee's Sanction Motion, the Court must examine the "clear evidence" beginning with whether or not Fritzsch was justified in his assertion that the Trustee simply ignored the language of the Memorandum Agreement, as referenced in the Tioga Park Plan, in having a realtor appointed and commencing the action in State Court to have the Hawkins evicted with the ultimate goal of selling the Colesville property. In his response to the instant Rule 9011 motion, Fritzsch contends that his conduct in filing the Contempt Motion on March 20, 2008, approximately a month after the Eviction Order, was not sanctionable because it was the subject of "much time and debate" between Fritzsch and Hawkins and he (Fritzsch) was simply bowing to the wishes of his client who insisted that this Court "had to be made to follow its own orders," and "couldn't simply turn a blind eye to its own words." *See* Response of Fritzsch to

---

**15.** This comports with representations made by the Trustee in his motion seeking the authority to employ a realtor to market the Colesville property that the real property was "property of Debtor Hawkins Family, LLC's estate." *See* Trustee's Application to Retain Real Estate Broker at ¶ 2 (Dkt. No. 569).

Sanction Motion, dated June 9, 2008 (Dkt. No. 745) at ¶ 11.

A review of the docket of this case and the various orders of this and other courts simply does not support the allegedly noble purpose being pursued by Fritzsch and Hawkins in filing the Contempt Motion. Beginning with the Trustee's Motion to Compromise in November 2004 in which he very clearly asserted at ¶ 50 that he was accepting payment of $70,000 for application towards repayment of priority sales tax claims "without prejudice to the rights of Southern Tier Acquisition, LLC and Jeffrey Gural to contest any further obligation to Mr. Hawkins with respect to the purchase of his residence" and ending with the Eviction Order of Judge Tait, it is obvious to everyone involved in this case, except Fritzsch and Hawkins, that, at least with respect to the Trustee, Hawkins' rights in the Colesville property via the Memorandum Agreement no longer exist. If anyone has acted with "a blind eye" it has been Fritzsch and Hawkins who continue to make incredulous assertions that the Trustee, in compromising rights belonging to the Hawkins as chapter 11 debtors and to their estates, has acted in contempt of the Tioga Park Confirmation Order by taking steps to eventually liquidate the Colesville property belonging to Hawkins Family, LLC. As explained by Lisa Tang, Esq., attorney for Jeffery Gural, at the hearing on the Motion to Compromise on January 27, 2005, the Memorandum Agreement contemplated that all of the properties of the Debtors' estates would be sold and Asolare would be required to bid on the Colesville property, however high the bidding price went. As the successful bidder, Asolare would be in a position to sell the Colesville property, because it would no longer be property of the Hawkins Family, LLC estate, to the Hawkins at the agreed purchase price of $100,000. Hawkins and Fritzsch fail to acknowledge that once the Trustee was appointed on September 16, 2004, some three and a half months after the Confirmation Order had been signed, the Colesville property became an asset for which he was responsible to administer on behalf of the creditors as long as no actions had been taken under the terms of the Memorandum Agreement to transfer the Colesville property to Asolare.

In the letter dated September 27, 2004 written on behalf of Asolare, Southern Tier Acquisition, Jeffrey Gural and John Simmons, Fritzsch was notified that no effort by motion or by a separate confirmed chapter 11 plan to transfer the property to Asolare had been made on behalf of the Hawkins. Admittedly, in November 2004 the Trustee filed his motion to compromise certain claims of the estates arising from the Confirmed Plan in Tioga Park for purposes of liquidating several sources of money to help fund the estates. However, as this Court acknowledged in its Remand Order, the $100,000 provision in the Disclosure Statement/Memorandum Agreement remained unaltered. *See* Remand Order at 13.

Over the ensuing four years since the Motion to Compromise was granted by this Court and up until the Sale Order was signed by the Court on July 8, 2008, the Hawkins have had ample opportunity to resolve what rights they may have had to purchase the Colesville property as provided to them under the terms of the Memorandum Agreement whether by settlement or litigation with Asolare. Instead, those rights were resolved in State Court in the action commenced by the Trustee in 2007 by way of Judge Tait's Eviction Order. To have filed the Contempt Motion, in the view of the Court, was objectively unreasonable given the fact that the Trustee was merely carrying out his statutory and fiduciary duty to the

estates of the Jointly Administered Debtors. While the day may come when an appellate court or courts may reverse some or all of the prior orders of this and other courts who have dealt with these and other issues emanating from the Tioga Park Plan, until that day arrives, those orders constitute the law of the case. *See Maness v. Meyers*, 419 U.S. 449, 459, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975); *see also Class v. Norton*, 507 F.2d 1058, 1060 (2d Cir.1974) (stating that "[o]ne is bound to obey an order issued by a court with jurisdiction over the person and subject matter unless and until that order is reversed by appropriate judicial proceedings"). Under the circumstances enumerated herein, the Court must conclude that the claims of Hawkins and Fritzsch on which they based the Contempt Motion were groundless. This conclusion finds support in Judge Kahn's recent dismissal of the appeal of the Contempt Order which he found without basis.

 The Court is cognizant of the fact that the purpose of Rule 9011 sanctions is to deter rather than compensate the party seeking sanctions. *See* Edward D. Cavanagh, *Rule 11 of the Federal Rules of Civil Procedure: The Case against Turning Back the Clock*, 162 F.R.D. 383, 395 (1995) (noting that "[w]hile it is true that the abused party may have gone to some expense, which in certain circumstances may have been considerable, in defending against a baseless claim, the goal of compensation under Rule 11 is secondary to deterrence."); *see also* The Advisory Committee Notes to the 1993 Amendments to Fed.R.Civ.P. 11 (indicating that "if a monetary sanction is imposed, it is ordinarily paid into court as a penalty. However, under unusual circumstances, particularly for (b)(1) violations, deterrence may be

ineffective unless the sanction not only requires the person violating the rule to make a monetary payment, but also directs that some or all of this payment be made to those injured by the violation."). In this case, the Trustee intends to seek compensation from the estates for the costs incurred by him in responding to Hawkins' and Fritzsch's various motions and pleadings which have delayed the distribution of funds to the creditors of the Jointly Administered Debtors. The Court concludes that the Trustee is entitled to an award of attorney's fees in connection with services rendered in defending the Contempt Motion pursuant to Fed.R.Bankr.P. 9011(b)(1) and (3). Not only did their Contempt Motion and pleadings in the case delay the Trustee's administration of the estates since his appointment, they also were without factual or legal basis given the various courts' orders in existence at the time of the motion.

Based on the foregoing, it is hereby

ORDERED that the Trustee's Sanction Motion is granted to the extent that he is seeking an award of costs and attorney's fees from both Hawkins and Fritzsch; it is further

ORDERED that the Trustee file and serve on the Hawkins and Fritzsch a summary of the amount of fees and costs sought, along with copies of his law firm's time records, related to the services provided in defense of the Contempt Motion, as well as in preparing and prosecuting the Sanction Motion within fifteen (15) days of the date of this Order;[16] and it is further

ORDERED that the Trustee's request made in his Response, filed on June 27, 2008, for what he has termed a "vexatious litigant order," is denied based on a finding that at this time there is no basis to

---

**16.** Upon receipt of the time records, the Court will issue an Order with respect to the

amount and allocation of payment that amount between Hawkins and Fritzsch.

provide such relief under these circumstances.